Court 18-03-703, Emily Weinstein v. Fox News 810-Network Good afternoon. Who's the court? My name is Adrian Shrankus. I represent the likes of McGarver and Hill. This is the most straightforward case of the day. I only am asking you to do one thing. I want you to take a look at the evidence. I want you to find that my client's treatment on her shoulder after September 8, 2011 is related to her original injuries. The evidence is overwhelming in favor of my client, starting at the beginning. The commission, it is undisputed that she injured her shoulder, that she injured her back, that she had other injuries as related to her fall. These are undisputed facts. It is undisputed that the treatment that she had up until 9-8-11 is related to this fall. It did not include post-treatment surgeries and the medical treatment and the time off work after the 8th. It relied on the opinion of Dr. Burr, who was the developmental examiner who examined my client twice. The first time, Dr. Burr said there was nothing wrong with her. The second time he was the examiner, he said, well, her condition hasn't been getting better from the surgery. His pains are inconsistent. That's one thing that you need to know about these pains. The first time he was the examiner, the second time her condition didn't get any better. The other thing you know about Dr. Burr is that he didn't have all the medical records when he examined my client. He didn't review any of the physical therapy records, which showed a day in and day out of complaints to the bodyguards that he was examining. The third thing is that when he was deposed, he testified under oath that he was presented with the same person, the same type of person, with the same conditions, the same findings, that he had done surgeries on these same patients before, except he thought in this case it was actually inappropriate. And yet the commission still relied on the opinion of Dr. Verma over the opinions of Dr. Melliot, Dr. Silver, radiologist Parizza, and Dr. Kremsler also noted the shoulder complaints. So Dr. Verma examined the petitioner on two separate occasions, reviewed the medical records, in a sense performed an internal examination, he reviewed the MRI. He didn't review all the records, he didn't have all of them. So, well, he did those things I just indicated. So why is there not a sufficient basis for his opinion? I think the opinion of Dr. Verma had gone over. Actually, believe it or not, I could hear you back there. Well, I'll reiterate what I said before. The doctor didn't have all the records, number one. Number two, his opinion of working consistent. The first time that he saw her, he said there was nothing wrong with her. The second time he saw her, he said, oh, her condition didn't get any better with surgery. So either she has a condition or she doesn't. Okay, Dr. Verma doesn't take a lane here. He's inconsistent. He also testified under oath that if he was presented with the same type of person that my client would have presented to him, he has done surgeries on these type of patients before. Except not in this case. The only difference between the hypothetical that I gave him and my client is that in one case he's being paid by the insurance company to give an opinion, and in the other case the client's paying him. It's the only difference. Now, we also have other, we have, the reason why I'm asking for you to re-weigh this evidence is based on a decision that was written by this court in 1989. We don't re-weigh evidence here. Okay. How about examining the foundation for the evidence that was relied on, see if it's sufficient or not. I believe that I can overcome the high burden of the FS-8 standard when looking at the evidence in this case. I believe this court can rely upon Edgecombe as an example of why they did this before. I think it's remarkable the similarities between that case and this case. The number of doctors, the type of treatment, the way that the courts viewed the independent examiner versus the treating physicians and the surgeon. And also, most importantly, the health court in that case, Your Honors, found that the internal examination done during the surgery was the most important factor in determining which doctor it should rely upon. And here we have Dr. Silver who performed the surgery. He performed a fistula clavicle resection. He did a lice adhesions. He performed a surgery that also degraded the frayed rotator cuff that he found during the surgery. You're talking about Edgecombe now, right? I'm talking about my case. Well, you were citing to Edgecombe. You're using that as an analogous case, right? Yes. Okay. And didn't they say that Dr. Weininger, in that case, according to claimant's armory, but a testimony examined her for approximately seven minutes before he opined his conclusions. They specifically mentioned that, and that was a factor. There was no cursory examination in this case of seven minutes, was there? Well, I don't think it was time, but I would argue it was as cursory in this situation as it was in Edgecombe. He performed even fewer objective examinations on my client than the 90-day examiner in Edgecombe. Well, since he examined her on two separate occasions, how could it be less than seven minutes? I don't believe that the factor was the time. I don't think that that's what the court cites in that case. That was in Edgecombe. They mentioned it was seven minutes in the decision. The internal examination of the surgery was, I believe, in my opinion from my reading of it, a determined factor. Probably the surgeon would be in a better position, you're right, but that doesn't necessarily carry the date, does it? Right. But that's how I get back to the internal problem with Burma's opinions. He's inconsistent. His first opinion isn't different than the second opinion. First he says there's nothing wrong with her, and then he says her condition has not changed. That the surgery didn't help her because she still had the pain. So does she have a condition or does she not have a condition? Who's Bovis? Ms. Bovis. Who's that? That was the accountant that was her boss. She testified she was dancing in a chair or something? Yes. She was also sued for using a racial slur, and that was one of the bones of contention between the parties. They were not on good terms. Ms. Bovis also attempted on many times to keep my client from going to physical therapy when she was scheduled for physical therapy. Did the commission cite Bovis in their decision? Did they cite her testimony in support of their decision? They did. Who judges the credibility of the witnesses? Well, the commission does. Right. But that is, in and of itself, how could that be a determinant of her condition? There's no timeframe for when this happened. She said at some point in time after the accident she saw her do this. There's no citation. I mean, you can give it any—yes, she testified to it, but what weight can you really give to it? There's nothing in there to give you the precise timeframe when this occurred, what she did. They're sitting in cubicles as far away from this corner to this corner. And you want to tell me she's sitting down, raising her hands in the air like she just don't care, and she's saying that is a determinant of somebody's not injured? I mean, look, they cited it, but how much weight they actually gave it versus the doctor's opinion? That's up to the courts to decide, and I think that you should decide in my client's favor, especially because Dr. Silver noted the actual injuries during the surgery. This is undisputed. Undisputed that there was injuries that were there in the surgical notes, visualized by a doctor, and repaired by a doctor just as in actual. Now, what we have here is totality of evidence. There's a number of undisputed facts in my client's favor. She had never had a shoulder surgery or shoulder injury in her life. She was 36 years old. She was dancing for a church. She was an advanced teen. She played volleyball. She had children. She still does have children. She was a very active, vivacious woman who was waylaid by these injuries. Not only that, but it's in the record. They delayed her treatment for months. My opponent uses that against my client by saying that she waited eight months to go back to the doctor. The doctor said, go home now. Continue the surgery you authorized. There's no treatment that could eventually fail conservative treatment just as in actual. So what I'm asking you to do today is take a look at the opinions of Dr. Miller, the radiologist who found injuries on the rotator cuff, and have a nice 80-year-old life. Dr. Miller, you have a shoulder injury. Dr. Silver, the formalist, the doctor's advanced care taker, took the complaints that are physical therapy. I want you to give this evidence more weight than Dr. Berman's inconsistent testimony. No one found that my doctors weren't credible. They simply relied on it and gave them more weight than my doctors. When we look at the evidence, Dr. Berman's opinion just doesn't hold up. There are holes you could drive a bus through. I've already put a few of those out there. He didn't have all the medical records. He changed his opinion to suit the situation. The first issue is nothing wrong. Then it's, oh, the surgery didn't overcommission anyone. Saying she still has a condition, even though he denies it the first time he sees her. He discounts the fact that she has to go to the hospital as a result of a cordial injection that she took that was diagnostically in nature, which is one of the reasons why they sent her to a surgeon. He doesn't even review those records. But yet he has relied on it over and above four of the doctors who treated her for three years. Now, what am I asking for? I'm asking for this to be returned to the commission for determination consistent with a finding that the treatment after 9-8-11 is related to the original work accident and fall on 2-1-1. I'm asking for the benefits you pay, the medical bills you pay, and for determination of currency in relation to the shoulder. Would that answer any questions I've done? Counsel, you'll have time and reply. Thank you. Thank you, counsel. You may respond. I'm glad I'm on the academic company, Fox News. The issues presented in this appeal are cost-benefit, resource necessity of medical treatment as it relates specifically only to the right shoulder condition. These are factual issues. They're within the purview of the commission. I need you to look at the commission's decision. The commission reviewed medical evidence, resolved conflicts in medical opinions, and evaluated the credibility and determined the credibility of witnesses. The commission determined that the ailment had suffered a right shoulder strain and was resolved by September 8, 2011, and it's the ability to give contention that this commission's decision is supported by sufficient evidence in the record. First, the commission reviewed conflicting medical testimony, and the medical testimony would be conflicting evidence between Dr. Burns and Dr. Silver. Would Dr. Silver arguably be in a better position to assess the nature and extent of the injury by being a surgeon? Arguably, but in this case, Dr. Verma looked at the evaluation of the petitioner, and this was only a couple of months after the accident, reviewed her medical records, reviewed the same number of films, and concluded that, and I will argue that, his opinions are consistent. She didn't have a shoulder condition. She had full, painless range of motion, normal strength when we evaluated her September 8, 2011, normal lumbar alley. Her shoulder was completely normal. She didn't need surgery. Did you review the Edgecombe decision? I did review the Edgecombe decision. Counsel for the claimant says that Edgecombe is very analogous here and should be controlling. So how do you distinguish this from Edgecombe? This case is distinguishable from Edgecombe for several reasons. First, there's no evidence in this case that Dr. Verma's examination was cursory, as the court deems it to be in Edgecombe, or that he is somehow not qualified to render opinions regarding her shoulder condition. He's a board-certified orthopedic surgeon. He specializes in treating knees and shoulders. He reviewed all the evidence in the case, including an insight into her shoulder that were wrong. He concluded that her shoulder was completely normal. There's also the difference in the various doctors. Dr. Mejia was the primary care provider who diagnosed her only with the shoulder strain. The treatment was prior to the IME with Dr. Verma. In September, Dr. Kranzler treated her for the lumbar spine. It was not called her shoulder treatment. I believe the visit that was referenced in Helen's brief is a note in January 2011, prior to the examination of Dr. Verma, when Dr. Verma determined that she had normal shoulder. Dr. Kranzler is a radiologist. He did not examine her for objective examination. He was just looking at films. Dr. Verma is an orthopedic surgeon, and he interpreted that as normal. There's also the difference in that the commission also found that the appellant's pain complaints were not credible. The commission cited the testimony of Kimpa Face, who observed her following the accident with her arms raised above her head, dancing, swinging her arms back and forth. This is not consistent with someone who has the same shoulder injury, much less been requiring surgical intervention. This is a credibility determination made by the commission, which distinguishes itself, obviously, from the actual decision whether there was no such determination. In summary, the commission resolves these conflicting medical opinions to be fine-tuned for credibility of witnesses. There's sufficient evidence in the record to support the commission's finding that her alleged condition after September 8, 2011, was not causally related to the accidents that are in the treatment, and necessary in a compelling respect to the request of this court on the decision of the commission. Thank you, Counsel. Thank you. Counsel, you may reply. I would like to reiterate to the judges that Verma wasn't just free from the hallucination. She also had back surgery. She was treated for a very long time. In regard to her back, that was also disputed for quite a period of time until they got to an unspecified evaluation that tied up her complaints. So, is the argument really that she fell, her back complaints were credible, her shoulder complaints weren't? Is this really a person who would go undergo treatment for almost three years and have surgery? Is this that type of person? What you're really looking for here is to try and understand how someone would go through this process with an eternally normal shoulder. Now, it's said over and over again that her shoulder was normal. That's simply not true. Okay? Objectively, it's not true. The MRI shows tendinitis. It showed other issues in the MRI that was noted by the doctors. There were injuries visualized by Dr. Silver. These are not the findings of someone who made up an injury. This is not the findings of someone who had a simple shoulder strain. If this was not a workers' compensation case, there wouldn't even be a discussion about having laparoscopic surgery on the shoulder after failing two years of conservative treatment. The only reason why it's here is based on a dispute on an independent medical examination by a doctor who was inconsistent, who changed the story, who testified that he would probably do the same surgery that Dr. Silver did if she was his client or the patient, and also didn't have all the medical records in his possession. Now, we can talk about how much time was spent during the examination, but that's also unknown. We don't know how much time. There's no testimony with regard to this. So we don't know that he only spent seven minutes? We don't. He could have spent five minutes. And he could have spent five hours. He didn't. How do you know? Well, then where's the evidence of how much time he spent? Do we speculate on that, how long it took? It's up to you. You're the judges. You can review the evidence for yourself. It varies from report. His report's two pages. I mean, he's not writing a novel. He didn't spend five hours. He didn't spend an hour with her. He didn't spend more than ten minutes with her. I wouldn't bet every dollar on the pot. Well, you can bet all you want, but we have to decide it based on the evidence in the record, and there's no evidence in the record as to how much time he spent. Right. Even if I can see that, even if I can see that the time period is unknown, you still have all the factors used in Edgecombe to rely on my doctors over their doctors, and the biggest thing is the internal examination. Okay. I have a question. So I'm not sure that we've addressed in Edgecombe that there was also horrible reasoning in addition to the timing and how much the doctors had seen the patient, that there was no evidence that tests would have been conclusively determinative of the condition, and that the particular doctor in Edgecombe didn't him or her self-perform the test. So it seems as though there's an additional argument that the basis for the doctor's opinions were flawed. You're talking in a clinical examiner? In Edgecombe. I think also in Edgecombe that there was a number of tests, and probably up to that, there wasn't determinative at all. That was one of the biggest reasons why this surgery was being denied. It wasn't until actually the doctor visualized the bulge in the operative report there was actually something found, and the respondent took the objective to the fact that they had actually taken the disc material out of his body, which you didn't find that to be persuasive because you still visualized the injury. The fact that he visualized the injury is the number one thing to rely on in relying on a surgeon's opinion, more than any kind of medical examiner. Now, the treatment leading up to the IUDs, there was nothing conclusive. They didn't have MRI back then, I guess. Therapeutically, there wasn't any of those things conclusive. There was x-rays that were done. The objective testing was all in place, and up until the point of the surgery that was done, there was not a need to be an actual assertible injury. So, I mean, there are small differences between this case and that case, but I think when taking it on a whole, you're talking about three or four doctors on one side who all treated this patient over the years, reviewed the evidence in front of them, reviewed all the records, saw this patient on a day-in and day-out basis versus an independent medical examiner who maybe spent a little over an hour with her, who didn't have all the records, who changed his opinion, who testified that he would probably do the same surgery if it was his patient. So I think we should fight for my client. I think we should award her with a medical certificate. I think we should allow her to be able to move forward with having bills paid and make her whole for this injury that she sustained for too long. Thank you. Thank you, counsel. Both your arguments in this matter will be taken under advisement. The written disposition will issue.